# 23-6055-cr

United States Court of Appeals
For the Second Circuit

———————————————

Docket No. 23-6055-cr

———————————————

UNITED STATES OF AMERICA,

*Appellee,*

-against-

ELLVA SLAUGHTER,

*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————

**BRIEF FOR DEFENDANT–APPELLANT
ELLVA SLAUGHTER**

———————————————

Edward S. Zas
Federal Defenders of New York, Inc.
 Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8742

*Counsel for Ellva Slaughter*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF JURISDICTION ......................................... 1

STATEMENT OF THE ISSUE ................................................. 1

STATEMENT OF THE CASE ................................................. 3

    A.   Procedural Posture ................................................... 3

    B.   Factual and Procedural Background ...................... 3

        1.   Appellant is charged with illegal possession
            of a firearm ................................................... 3

        2.   Appellant moves to dismiss the indictment ................. 4

        3.   Appellant is convicted and sentenced ........................... 5

SUMMARY OF ARGUMENT .................................................. 7

STANDARD OF REVIEW ....................................................... 8

ARGUMENT .............................................................................. 10

    Appellant's grand jury came from a pool that significantly and
    systematically underrepresents Blacks and Hispanics, in violation of
    his constitutional and statutory right to a grand jury drawn from a
    fair cross-section of the community .................................................... 10

    A.   Background ........................................................ 10

        1.   The Southern District of New York's
            jury-selection plan ...................................... 10

        2.   The motion to dismiss ............................... 12

        3.   The District Court's ruling ........................... 19

    B.   Appellant has established at least a prima facie violation of
        his constitutional and statutory right to a grand jury chosen
        from a fair cross-section of the community. ......................... 25

        1.   Blacks and Hispanics are "distinctive" groups
            in the community ....................................... 29

2. The representation of Blacks and Hispanics in
venires from which grand juries are selected
in the Southern District of New York is not
"fair and reasonable" .................................................... 30

3. The underrepresentation of Black and Hispanics
is attributable to the systematic exclusion of
these groups in the jury-selection process .................. 37

CONCLUSION ........................................................................... 48

CERTIFICATE OF COMPLIANCE ....................................... 49

CERTIFICATE OF SERVICE ................................................. 50

# TABLE OF AUTHORITIES

## Federal Cases

*Alston v. Manson,*
  791 F.2d 255 (2d Cir. 1986) ................................................................27

*Ballard v. United States,*
  329 U.S. 187 (1946)........................................................................46

*Barber v. Ponte,*
  772 F.2d 982 (1st Cir. 1985) ...........................................................38

*Berghuis v. Smith,*
  559 U.S. 314 (2010)...................................................................24, 31

*Duren v. Missouri,*
  439 U.S. 357 (1979)...................................................................passim

*Hernandez v. Texas,*
  347 U.S. 475 (1954)........................................................................39

*Herring v. United States,*
  555 U.S. 135 (2009).........................................................................5

*Murphy v. Johnson,*
  205 F.3d 809 (5th Cir. 2000)..........................................................26

*Ramseur v. Beyer,*
  983 F.2d 1215 (3d Cir.1992) ..........................................................40

*Schanbarger v. Macy,*
  77 F.3d 1424 (2d Cir. 1996) ......................................................21, 28

*Smith v. Texas,*
  311 U.S. 128 (1940)........................................................................47

*Swain v. Alabama,*
  380 U.S. 202 (1965)........................................................................38

*Taylor v. Louisiana,*
  419 U.S. 522 (1975)........................................................................47

*Thiel v. S. Pac. Co.,*
  328 U.S. 217 (1946)........................................................................46

*United States v. Biaggi,*
  909 F.2d 662 (2d Cir. 1990) .....................................................passim

*United States v. Colon,*
  64 F.4th 589 (4th Cir. 2023) .............................................................9

*United States v. Erickson,*
  999 F.3d 622 (8th Cir.), *cert. denied*, 142 S. Ct. 51 (2021)....................8

*United States v. Gelb,*
  881 F.2d 1155 (2d Cir. 1989) ........................................................ 28

*United States v. Grisham,*
  63 F.3d 1074 (11th Cir. 1995) ..................................................... 8

*United States v. Haak,*
  884 F.3d 400 (2d Cir. 2018) ....................................................... 9

*United States v. Hernandez-Estrada,*
  749 F.3d 1154 (9th Cir. 2014) ............................................. 29, 30, 31

*United States v. Jackman,*
  46 F.3d 1240 (2d Cir. 1995) ............................................. 26, 27, 30, 43

*United States v. Jones,*
  No. Crim. A. 05-231, 2006 WL 278248 (E.D. La. Feb. 3, 2006) ..... 21, 45

*United States v. LaChance,*
  788 F.2d 856 (2d Cir. 1986) ....................................................... 26

*United States v. Lawrence,*
  553 F. Supp. 3d 131 (S.D.N.Y. 2021) ........................................ 5

*United States v. Little Bear,*
  583 F.2d 411 (8th Cir. 1978) ............................................... 21, 45

*United States v. Marutyan,*
  No. 20 Cr. 652 (VM), 2022 WL 2078193 (S.D.N.Y. June 9, 2022) ......... 5

*United States v. Middlebrooks,*
  No. 21 Cr. 89 (RMB), 2021 WL 2402162 (S.D.N.Y. June 10, 2021) .... 19

*United States v. Miles,*
  748 F.3d 485 (2d Cir. 2014) ....................................................... 6

*United States v. Montague,*
  67 F.4th 520 (2d Cir. 2023) ...................................................... 17

*United States v. Neighbors,*
  590 F.3d 485 (7th Cir. 2009) ..................................................... 8

*United States v. Odeneal,*
  517 F.3d 406 (6th Cir. 2008) ..................................................... 8

*United States v. Osorio,*
  801 F. Supp. 966 (D. Conn. 1992) ........................................... 26

*United States v. Pepe,*
  747 F.2d 632 (11th Cir. 1984) ................................................... 31

*United States v. Reyes,*
  934 F. Supp. 553 (S.D.N.Y 1996) ....................................... passim

*United States v. Richardson,*
  958 F.3d 151 (2d Cir. 2020) ....................................................... 9

iv

*United States v. Rioux,*
  97 F.3d 648 (2d Cir. 1996) ......................................................... passim
*United States v. Rodriguez-Lara,*
  421 F.3d 932 (9th Cir. 2005) ................................................................ 29
*United States v. Savage,*
  970 F.3d 217 (3d Cir. 2020) ............................................................ 8, 39
*United States v. Smith,*
  No. CR 19-324 (BAH), 2022 WL 425059 (D.D.C. Feb. 11, 2022) ......... 41
*United States v. Tagliaferro,*
  No. 19-CR-472 (PAC), 2021 WL 1172502 (S.D.N.Y. Mar. 29, 2021) ..... 5
*United States v. Test,*
  550 F.2d 577 (10th Cir. 1976) ............................................................. 38
*United States v. Torres-Hernandez,*
  447 F.3d 699 (9th Cir. 2006) ................................................................. 8
*United States v. Weaver,*
  267 F.3d 231 (3d Cir. 2001) ......................................................... 41, 45
*United States v. Young,*
  822 F.2d 1234 (2d Cir. 1987) .............................................................. 25
*Vasquez v. Hillery,*
  474 U.S. 254 (1986) ............................................................................. 29

**State Cases**

*Smith v. Commonwealth,*
  649 N.E.2d 744 (Mass. 1995) .............................................................. 28
*State v. Lilly,*
  930 N.W.2d 293 (Iowa 2019) .............................................................. 33

**Federal Statutes**

18 U.S.C. § 922(g)(1) ........................................................................ 3, 4, 6
18 U.S.C. § 3231 ...................................................................................... 1
28 U.S.C. § 1291 ...................................................................................... 1
28 U.S.C. § 1863 ............................................................................... 10, 18
28 U.S.C. § 1867(d) ............................................................................... 27
28 U.S.C. § 2254(d)(1) ........................................................................... 24

v

## Other Authorities

Amnesty Int'l, *Racism and the Administration of Justice* (2001) .......... 36

Chernoff, Nina W., *Wrong About the Right: How Courts Undermine the Fair Cross-Section Guarantee by Confusing it with EqualProtection*, 64 Hastings L.J. 141 (2012) ................................................................ 28

Plan of the United States District Court for the Central District of California for the Random Selection of Grand and Petit Jurors (effective July 15, 2019), https://www.cacd.uscourts.gov/sites/default/files/general-orders/GO%2019-07.pdf ....................................................................... 17

Sommers, Samuel R., & Marotta, Satia A., *Racial Disparities in Legal Outcomes: On Policing,Charging Decisions, and Criminal Trial Proceedings*, 1 Policy Insights from the Behavioral and Brain Sciences 103 (October 2014), https://journals.sagepub.com/doi .......... 36

United States District Court Eastern District of New York Jury Selection Plan (amended Jan. 31, 2023), https://img.nyed.uscourts.gov/files/local_rules/juryplan.pdf ............... 17

United States District Court for the Eastern District of Pennsylvania, Plan for the Random Selection of Grand and Petit Jurors  (July 18, 2017), https://www.paed.uscourts.gov/documents/jury/Jury%20Plan.pdf ..... 18

United States District Court for the Northern District of Illinois, Plan for Random Selection of Jurors (Jan. 8, 2020), https://www.ilnd.uscourts.gov/_assets/_documents/_forms/_press/ILN DJuryPlan.pdf. ................................................................................... 17

United States District Court for the Northern District of California, Plan for the Random Selection of Grand and Petit Jurors, Gen. Order No. 6 (amended Aug. 7, 2017) ........................................... 17

## STATEMENT OF JURISDICTION

Defendant-Appellant Ellva Slaughter appeals from a final judgment of conviction entered in the United States District Court for the Southern District of New York (Hon. Katherine Polk Failla) on January 13, 2023, following the oral imposition of sentence on January 6, 2023. *See* Appendix ("A.") 248-54 (judgment). A notice of appeal was timely filed on January 10, 2023. A. 247. This Court has jurisdiction under 28 U.S.C. § 1291. The District Court had jurisdiction under 18 U.S.C. § 3231.

## STATEMENT OF THE ISSUE

Both the Constitution and a federal statute guarantee the right to a grand jury drawn from a fair cross-section of the community. The Supreme Court has adopted a three-part test for establishing a prima facie violation of this right. The "defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due

1

to systematic exclusion of the group in the jury-selection process."
*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Slaughter moved to dismiss the indictment against him because his grand jury was not drawn from a fair cross-section of the community. In particular, he presented evidence that the Southern District of New York's jury-selection plan and procedures significantly and systematically underrepresent Black and Hispanic Americans. The District Court denied the motion on a single ground, ruling that Slaughter had not shown that the underrepresentation of these groups was due to "systematic exclusion."

The issue presented is whether, given the substantial evidence that the Southern District of New York's jury-selection procedures have long failed to produce representative grand juries, the District Court erred in ruling that Appellant had not established at least a prima facie violation of his right to a grand jury drawn from a fair cross-section of the community.

2

## STATEMENT OF THE CASE

### A.    Procedural Posture

Ellva Slaughter was convicted, following a bench trial on stipulated facts, *see* Fed. R. Crim. P. 23(a), of one count of illegally possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). He was sentenced to a term of imprisonment of time-served plus one month (totaling about 26 months), two years of supervised release, and a $100 special assessment. A. 248-54. This appeal followed.

### B.    Factual and Procedural Background

#### 1.    Appellant is charged with illegal possession of a firearm.

On November 6, 2020, officers of the New York City Police Department were patrolling an area of the Bronx in an unmarked police car. *See* Presentence Investigation Report ("PSR") ¶ 8. Around 8:45 p.m., they saw someone, later identified as Slaughter, a 44-year-old Black man (PSR at 2), allegedly driving a car with an inoperable center brake light and darkly tinted windows. PSR ¶ 8. The officers activated their police lights, but Slaughter did not pull over; instead, he led the police on a high-speed car chase. PSR ¶ 9. Slaughter's car ultimately came to a stop after striking a parked car. PSR ¶ 10. The police then

3

arrested Slaughter and recovered a loaded firearm from inside his car; it was found immediately below the center console on the passenger side of the vehicle. PSR ¶ 11.

A grand jury in the Southern District of New York returned a one-count indictment on April 5, 2021. A. 16-18. It charged that, "[o]n or about November 6, 2020, in the Southern District of New York and elsewhere," Slaughter, "knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year," knowingly possessed a firearm in and affecting commerce, in violation of 18 U.S.C. § 922(g)(1). A. 16.

### 2. Appellant moves to dismiss the indictment.

Slaughter filed a timely motion to dismiss the indictment. A. 19-59. He argued that his grand jury had not been selected from a fair cross-section of the community, as required by the Fifth and Sixth Amendments and the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861-78 ("JSSA" or "Jury Selection Act"). In support, he presented data and expert statistical analysis showing that the Southern District of New York's procedures for selecting grand and petit jurors significantly and systematically underrepresent Blacks (or

4

African-Americans) ("Blacks") and Hispanics (or Latinos) ("Hispanics").

*See* A. 24-59, 123-50.[1]

The District Court denied the motion to dismiss in an oral ruling.

A. 155-71. (A detailed discussion of the facts giving rise to the motion,

and the court's decision, appears in the Argument, Point "A," pp. 10-25,

*infra.*)

### 3.  Appellant is convicted and sentenced.

Slaughter subsequently moved unsuccessfully to suppress the

evidence against him pursuant to the exclusionary rule of the Fourth

Amendment, *see, e.g., Herring v. United States*, 555 U.S. 135, 139

(2009), arguing that the police lacked reasonable suspicion to stop his

car. After the court denied the motion, Slaughter waived his right to a

jury trial and proceeded to a bench trial on stipulated facts, *see*

Fed. R. Crim. P. 23(a), thereby preserving his right to appeal the

---

[1] Similar motions have been filed in several other cases in the
Southern District of New York, without success. *See, e.g., United
States v. Marutyan*, No. 20 Cr. 652 (VM), 2022 WL 2078193, at *1
(S.D.N.Y. June 9, 2022); *United States v. Lawrence*, 553
F. Supp. 3d 131, 134 (S.D.N.Y. 2021); *United States
v. Tagliaferro*, No. 19-CR-472 (PAC), 2021 WL 1172502, at *1
(S.D.N.Y. Mar. 29, 2021). This Court has apparently not reviewed
any of the rulings in these cases.

District Court's pretrial rulings. *See, e.g., United States v. Miles*, 748 F.3d 485, 487-91 (2d Cir. 2014) (per curiam) (reviewing a district court's pretrial rulings following a bench trial on stipulated facts).

The parties stipulated, *inter alia*, that on November 6, 2020: (1) the police recovered a firearm from the car Slaughter was driving; (2) Slaughter had previously been convicted of a felony; (3) Slaughter knew he had previously been convicted of a felony; and (4) the firearm had not been manufactured in New York. A. 178-80. The Government also proffered, without dispute, that venue was proper in the Southern District of New York. A. 203.

Given these stipulated facts, Judge Failla found Slaughter guilty of illegally possessing a firearm as a felon, in violation of § 922(g)(1). A. 205. On January 6, 2023, the court sentenced him principally to an imprisonment term of time-served plus one month (about 26 months). A. 241, 243. Slaughter completed his term of imprisonment on February 6, 2023. *See* https://www.bop.gov/inmateloc/ (search Reg. No. 46327-083).

## SUMMARY OF ARGUMENT

This Court should vacate Appellant's conviction and remand for further proceedings because he has established, at least prima facie, that the grand jury in his case was not selected from a fair cross-section of the community, as required by the Fifth and Sixth Amendments and the Jury Selection Act. In rejecting this argument, the District Court did not dispute that grand jury venires in the Southern District of New York regularly underrepresent Blacks and Hispanics, who are distinctive groups, and that, depending on the methodology and reference points used, the underrepresentation could be constitutionally significant. But the court nevertheless denied Appellant's motion to dismiss, holding that the underrepresentation of Blacks and Hispanics is not attributable to features of the Southern District of New York's jury-selection process, but instead results from "external forces."

This conclusion is erroneous: the underrepresentation is caused by practices adopted and decisions made by the creators and administrators of the jury-selection plan itself, such as the choice to rely exclusively on voter registration lists to compile jury wheels. These practices and decisions cannot be dismissed as "external forces" beyond

7

the control of jury officials; they are part of the jury-selection system. And because these practices consistently and significantly underrepresent Blacks and Hispanics, they violate the fair-cross-section requirement of both the Constitution and the Jury Selection Act.

## STANDARD OF REVIEW

This Court has not explicitly stated what standard of review applies to preserved fair-cross-section challenges. But it appears to review such challenges de novo. *See, e.g.*, *United States v. Rioux*, 97 F.3d 648, 654-59 (2d Cir. 1996) (conducting what appears to be plenary review of a fair-cross-section claim). This Court should expressly follow the many circuits holding that "[w]hether a defendant has been denied his or her right to a jury selected from a fair cross section of the community is a mixed question of law and fact, and is reviewed de novo." *United States v. Savage*, 970 F.3d 217, 254 n.30 (3d Cir. 2020); *accord, e.g.*, *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008); *United States v. Neighbors*, 590 F.3d 485, 491 (7th Cir. 2009); *United States v. Erickson*, 999 F.3d 622, 626 (8th Cir.), *cert. denied*, 142 S. Ct. 51 (2021); *United States v. Torres-Hernandez*, 447 F.3d 699, 703 (9th Cir. 2006); *United States v. Grisham*, 63 F.3d 1074, 1077

8

(11th Cir. 1995); *see also United States v. Colon*, 64 F.4th 589, 594 (4th Cir. 2023) (reviewing de novo whether "the district court violated the Sixth Amendment's fair-cross-section guarantee by excluding unvaccinated jurors"). De novo review is especially appropriate here because this appeal does not concern a dispute about the facts, which are essentially uncontested, but their legal significance—principally, whether they demonstrate a prima facie case of "systematic exclusion" under *Duren*'s third prong. *See, e.g., United States v. Richardson*, 958 F.3d 151, 154 (2d Cir. 2020) (holding that de novo review applies to mixed questions when the issue in dispute is "predominantly legal"); *United States v. Haak*, 884 F.3d 400, 408 (2d Cir. 2018) ("We review the legal significance of undisputed facts de novo.") (citing cases).

## ARGUMENT

**Appellant's grand jury came from a pool that significantly and systematically underrepresents Blacks and Hispanics, in violation of his constitutional and statutory right to a grand jury drawn from a fair cross-section of the community.**

## A.    Background

### 1.    The Southern District of New York's jury-selection plan

The JSSA requires each federal district court to "devise and place into operation a written plan for random selection of grand and petit jurors." 28 U.S.C. § 1863(a). Appellant's grand jury was selected pursuant to the Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York, which took effect in February 2009 ("Plan"). A. 38-47. The Plan uses voter registration lists as the exclusive source of names of prospective jurors. A. 39 (Plan, Art. III.A); *see also United States v. Biaggi*, 909 F.2d 662, 676-77 (2d Cir. 1990) (noting that an earlier jury plan similarly "use[d] voter registration lists as the exclusive source of names of prospective jurors"). From these names, two master jury wheels are constructed: one for the Manhattan courthouses (the "Manhattan Master Wheel") and one for the White

10

Plains courthouse. For the master wheels, jurors from each county are drawn from that county's voter registration list. *See* A. 40-41 (Plan, Art. III.A.1, III.B).

The Manhattan Master Wheel (also called the Foley Square division) contains names drawn from the counties of New York, Bronx, Westchester, Putnam, and Rockland. The White Plains master wheel contains names from Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess counties. For the three overlapping counties (Westchester, Putnam, and Rockland), the names are apportioned between the two master wheels to "reasonably reflect the relative number of registered voters of each county" within the respective wheels. A. 43 (Plan, Art. IV.B).

According to the Plan, the master jury wheels "shall be emptied and refilled by not later than September 1 following the date of each Presidential Election." A. 41 (Plan, Art. III.B); *see also United States v. Reyes*, 934 F. Supp. 553, 555 (S.D.N.Y 1996).

At least once a year, names are drawn randomly from the master jury wheels to meet the anticipated demand for jurors for the next six months. A. 41-42 (Plan, Art. III.D). The people whose names are drawn

11

are sent questionnaires regarding their qualifications to sit as jurors.
*Id.* Potential jurors are instructed to complete the questionnaire and
return it within ten days. A. 42 (Plan, Art. III.E). The names of persons
who complete and return the questionnaire, and who are found to be
qualified as jurors, constitute the qualified jury wheels. A. 41-42 (Plan,
Art. III.D). As with the master wheels, two separate qualified jury
wheels are maintained: one for the Manhattan courthouses (the
"Manhattan Qualified Wheel") and one for White Plains. When jurors
are needed, names are drawn at random from these wheels.
Summonses are sent to those whose names are drawn. A. 43-44 (Plan,
Art. IV.C-D); *Reyes*, 934 F. Supp. at 556. The Manhattan Qualified
Wheel from which Appellant's grand jury was drawn had been most
recently reconstituted on February 7, 2017. *See* A. 26, 126 n.3, 137, 140.

## 2. The motion to dismiss

After reviewing records relating to the Master and Qualified
Manhattan Wheels, Appellant timely moved to dismiss the indictment
under the Fifth and Sixth Amendments and the JSSA. *See* A. 19-59
(main motion), 122-50 (reply). Supported by two declarations from
Jeffrey Martin, a mathematician and expert on the study of jury data

12

(*see* A. 49-59, 137-50), the motion argued that (1) Blacks and Hispanics are "distinctive group[s]" in the community, (2) these groups are significantly underrepresented in the grand jury pool, and (3) the underrepresentation is the result of "systematic exclusion." *See Duren*, 439 U.S. at 364.

With respect to *Duren* prong 2 ("significant underrepresentation"), the defense cited data showing that, though Blacks and Hispanics make up 21.19% and 28.44%, respectively, of the jury-eligible population for Manhattan, they comprise only 16.08% and 19.41%, respectively, of the Manhattan Qualified Wheel. *See* A. 28, 52 (¶¶ 33-34), 159. These figures translate to an "absolute disparity"[2] of 5.11% for Blacks and 9.03% for Hispanics. A. 28-29, 52 (¶¶ 33-34), 161-62. The Government's figures were similar: they showed a slightly higher absolute disparity in the

---

[2] "Absolute disparity" is simply the difference "between [a] group's representation in the general population and the group's representation in the qualified wheel." *Rioux*, 97 F.3d at 655. For example, if Blacks comprise 10% of the entire population but just 2% of the qualified wheel, the absolute disparity is 8% (10 minus 2). The "absolute numbers approach" to disparity is closely related: it measures how many persons of a group would have to be added to a venire to ensure adequate representation. Thus, if the absolute disparity of Blacks is 8%, between four and five Blacks would have to be added, on average, to a jury pool of 60 persons to ensure adequate representation (8% of 60 equals 4.8). *See id.*

Manhattan Qualified Wheel of 5.72% for Blacks and 9.88% for Hispanics. *See* A. 89 (¶ 3), 96-97 (¶ 21), 161-62. As the District Court recognized, these disparities are "substantially greater" than the disparities this Court has been willing to tolerate. A. 162.

To meet *Duren*'s third prong ("systematic exclusion"), the defense presented evidence showing that the underrepresentation of Hispanics has persisted for at least a decade, and indeed has consistently increased, even though the underrepresentation was recognized as early as 1996. *See* A. 29-31, 53-54 (¶¶ 46-49). The defense also presented evidence showing that the underrepresentation is the result of specific attributes of the jury-selection process. These include:

- The Plan draws its master wheels exclusively from voter registration rolls, which underrepresent the number of jury-eligible Black and Hispanic New Yorkers. *See* A. 148 (¶ 106) (expert testimony of Jeffrey Martin that "[t]he choice to use the voter registration lists as the sole source of names causes underrepresentation of Black or African-American persons and Hispanic or Latino persons.").

14

- The S.D.N.Y. refills its master wheels only once every four years, which arbitrarily removes jury-eligible 18-to-21-year-olds (a population that overrepresents Blacks and Hispanics) from the prospective jury pool (A. 148 (¶ 107)). If the wheels were updated more frequently, more people in this age group would be able to serve.

- The District's procedures overrepresent those with stable housing over those without it (A. 148 (¶ 108)). As people move—either because they cannot afford rent or simply find a different home—their addresses become stale, resulting in undelivered jury questionnaires. If the wheels were updated more frequently, jury-eligible voters who have moved within the last four years would be less likely to be cut-off from jury service. Black and Hispanics voters are overrepresented in this category compared to their White peers. *See* A. 148-49 (¶¶ 107-108).

- The S.D.N.Y. chooses to remove "inactive voters"—people who are still registered to vote but whose status has been changed to "inactive" because the county elections board

15

concludes, often erroneously, that the voters have moved—from the wheels, which again disparately impacts Blacks and Hispanics, who are deemed "inactive" at higher rates than other groups. *See* A. 34, 145 (¶ 82).

●   The jury administrator has decided not to try to contact jurors who do not respond to jury-qualification questionnaires—whether because the questionnaires are deemed "undeliverable" or for any other reason. A. 149-50 (¶¶ 112-14, 119). This decision "causes under-representation of Black or African-American persons and Hispanic or Latino persons as compared to all persons mailed a qualification questionnaire." A. 149 (¶¶ 112-13).

The defense also noted that other federal districts have taken steps to achieve representative jury pools, thus demonstrating that minority underrepresentation is neither inevitable nor beyond the control of jury officials. These steps include: (1) creating jury lists from multiple sources, rather than voter registration rolls alone;[3] (2) refilling

---

[3] Several districts—including the Eastern and Western Districts of New York—compile jury lists from multiple sources, such as records from the

16

the master wheel every year, instead of once every four years;[4] and

(3) directing that, if a jury-qualification form is returned to the court as

"undeliverable," or if no response is received, the Clerk must randomly

draw the name of another person residing in the same zip code and mail

a new questionnaire to that person.[5] Indeed, the JSSA *requires* that

New York State Department of Motor Vehicles, the United States Citizen and Immigration Service, and the New York State Department of Labor. *See, e.g., United States v. Montague,* 67 F.4th 520, 540 (2d Cir. 2023) ("The Western District of New York draws not only from voter registration lists, but from DMV records, records from the Department of Taxation, records from the Department of Labor, and records from the Department of Social Services."); United States District Court Eastern District of New York Jury Selection Plan 1-2 (amended Jan. 31, 2023), https://img.nyed.uscourts.gov/files/local_rules/juryplan.pdf; United States District Court for the Northern District of California, Plan for the Random Selection of Grand and Petit Jurors, Gen. Order No. 6, at 2, Part V (amended Aug. 7, 2017) (stating that "driver's license and state ID information will be used to supplement voter record information for the creation of master jury wheels"), https://cand.uscourts.gov/wp-content/uploads/general-orders/abrogated-general-orders/GO_06_8-7-2017.pdf.

[4] Courts that refill their jury wheels yearly include the Central District of California. *See* Plan of the United States District Court for the Central District of California for the Random Selection of Grand and Petit Jurors 3 (effective July 15, 2019), https://www.cacd.uscourts.gov/sites/default/files/general-orders/GO%2019-07.pdf.

[5] Several districts employ this approach, including the Northern District of California, the Eastern District of Pennsylvania, and the Northern District of Illinois. *See* United States District Court for the Northern District of California, Plan for the Random Selection of Grand

17

jury plans go beyond voter registration lists when necessary to meet the fair-cross-section requirement. 28 U.S.C. § 1863 ("The plan shall prescribe some *other* source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title.") (emphasis added).

The Government opposed the motion. A. 60-121. It conceded that Blacks and Hispanics constitute "distinctive group[s]" under *Duren*. A. 66-67. But, relying on an expert report from Bernard R. Siskin, Ph.D., the Government claimed that Blacks and Hispanics are not

---

and Petit Jurors, Gen. Order No. 6, Part V, at 3 (amended Aug. 7, 2017), https://cand.uscourts.gov/wp-content/uploads/general-orders/abrogated-general-orders/GO_06_8-7-2017.pdf; United States District Court for the Eastern District of Pennsylvania, Plan for the Random Selection of Grand and Petit Jurors at 3 (July 18, 2017) ("For each juror summons and qualification form returned to the court as 'undeliverable' and those to which no timely response has been received, the Clerk will randomly draw the name of another person residing in the same zip code and mail a new juror summons and qualification notice to that person."), https://www.paed.uscourts.gov/documents/jury/Jury%20Plan.pdf; United States District Court for the Northern District of Illinois, Plan for Random Selection of Jurors 5 (Jan. 8, 2020) ("For all juror notification letters returned to the Court as 'undeliverable,' the Clerk shall issue the same number of new juror notification letters to be mailed to addresses within the same zip code to which the undeliverable notice has been returned."), https://www.ilnd.uscourts.gov/_assets/_documents/_forms/_press/ILNDJuryPlan.pdf.

unfairly represented when the jury-eligible community is compared to the relevant jury pool, which, the Government argued, should include not just the Manhattan Qualified Wheel, but also the Manhattan Master Wheel. A. 68. The Government also asserted that "any underrepresentation is the product of factors external to the jury selection process." A. 67.

### 3. The District Court's ruling

The court denied the motion to dismiss in an oral ruling. A. 155-71. Judge Failla stated at the outset that she "agree[d] with the reasoning and analysis" of other district judges that have denied similar fair-cross-section motions, and "incorporate[d] much of that analysis here." A. 157 (citing *United States v. Middlebrooks*, No. 21 Cr. 89 (RMB), 2021 WL 2402162 (S.D.N.Y. June 10, 2021), and *United States v. Ortiz-Molina*, No. 1:21 Cr. 173-LJL-1, Dkt. 47 (S.D.N.Y. July 27, 2021)).

The court agreed with the parties that Appellant's motion satisfied the first prong of the *Duren* test because Blacks and Hispanics are "distinctive" groups in the community. A. 158-59. The court also assumed, without deciding, that "the defendant has met his burden of

19

showing substantial or significant underrepresentation." A. 163. The court noted, for example, that the percentage of Blacks and Hispanics in the community, compared with the percentage of Blacks and Hispanics in the Manhattan Qualified Wheel, showed that "the disparities between the qualified wheel and the community are substantially greater than the absolute disparities the Second Circuit has approved." A. 162; *see, e.g., Biaggi*, 909 F.2d at 678 (declaring that an absolute disparity of 3.6% for Blacks and 4.7% for Hispanics "press[es] the . . . 'absolute numbers' approach to its limit").

The court nevertheless declined to find even a prima facie fair-cross-section violation under *Duren*. It ruled that Appellant did not satisfy *Duren*'s third prong because he did not show that the underrepresentation of Blacks and Hispanics is due to "systematic exclusion," i.e., due to the jury-selection process itself, rather than "external forces." A. 163. The court noted that various cases define "external forces" to include "demographic changes," such as a person's decision to change residences, and "inclement weather," such as a hurricane. A. 163-64 (citing *Rioux*, 97 F.3d at 658 (stating that "[t]he inability to serve juror questionnaires because they were returned as

20

undeliverable" was due to "outside forces, such as demographic changes"); *Schanbarger v. Macy*, 77 F.3d 1424, 1424 (2d Cir. 1996) (per curiam) (declaring, in dictum that this Court has since rejected, *see* pp. 25, 28, *infra*, that, "absent positive evidence that some groups have been hindered in attempting to register to vote, a jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of Equal Protection"); *United States v. Little Bear*, 583 F.2d 411, 414-15 (8th Cir. 1978) (holding that any underrepresentation of "rural" jurors in a single trial was caused by inclement weather, not the jury-selection system); *United States v. Jones*, No. Crim. A. 05-231, 2006 WL 278248, at *3 (E.D. La. Feb. 3, 2006) (holding that any underrepresentation of Blacks was caused by Hurricane Katrina, not "by any systematic flaw or defect" in the jury-selection plan)).

The court ruled that these cases and the "principle of external forces" "largely foreclose" Appellant's motion because "he has not identified a systematic defect in the jury selection process." A. 164. The court rejected his argument that "the very existence of these persistent and increasing disparities proves that they are the result of systemic

exclusion." A. 165. Citing Judge Liman's decision in *Ortiz-Molina*, and Judge Berman's decision in *Middlebrooks*, the court ruled that Appellant's argument would collapse prongs 2 and 3 of the *Duren* test "because [a] defendant would meet his burden by showing a persistent—but not systematic—underrepresentation of a distinctive group." A. 165.

The court also rejected Appellant's alternative argument that several specific and longstanding practices in the Southern District of New York "are responsible for disparities in the qualified wheel"— including the practice of relying solely on voter registration lists to compile jury venires, the choice to update the master wheels only once every four years, and the decision not to take steps to follow up on or re-issue jury questionnaires that are never returned or are returned as undeliverable. *See* A. 165. The court stated that Appellant "has not put forth evidence that any of these practices causes or contributes to the identified disparities." A. 166. In fact, however, the defense *did* present evidence—sworn testimony from expert statistician Jeffrey Martin—on the causation issue. As Martin declared, "The choice of refilling the Master Jury Wheel only every four years leads to underrepresentation

in any community where the demographics are changing such as the
Manhattan Division of the Southern District of New York. A. 139 (¶ 22).
Similarly, Martin opined that "the under-representation of Hispanic or
Latino persons on the Qualified Jury Wheel is not the result of random
factors, chance, or luck, but is the result of a systematic process that
under-represents Hispanic or Latino persons." A. 143 (¶ 61). Martin
further averred that "[t]his historical and increasing under-
representation of Hispanic or Latino persons is caused by increasing
percentages of Hispanic or Latino jury eligible persons in the
community over time and a Qualified Jury Wheel that generally under-
represents Hispanic or Latino persons and remains constant for four
years." A. 143 (¶ 66). And he explained that "[t]he choice to use the
voter registration list as the sole source of names causes
underrepresentation of Black or African-American persons and
Hispanic or Latino persons." A. 148 (¶ 106). He specifically noted that
"[t]he exclusion of 18, 19, 20, and 21-year-olds as the jury list ages to 4
or more years causes under-representation of Black or African-
American persons and Hispanic or Latino persons." A. 148 (¶ 107).

The court also cited *Berghuis v. Smith,* 559 U.S. 314 (2010), for the proposition that "a defendant cannot make out a prima facie case merely by pointing to a host of factors that, individually or in combination, might contribute to a group's underrepresentation." A. 166 (quoting *Berghuis*). In fact, however, the court took this language from *Berghuis* out of context. *Berghuis* involved a petition by a state prisoner under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Thus, he had to show that the state court's adjudication was not merely erroneous, but "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1). The *Berghuis* Court merely noted that "[n]o *'clearly established' precedent of this Court supports* [*petitioner's*] *claim* that he can make out a prima facie case merely by pointing to a host of factors that, individually or in combination, might contribute to a group's underrepresentation." 559 U.S. at 332 (emphasis added). The Court did not address, much less decide, what causal showing, if any, a federal defendant on direct appeal must make—beyond showing that underrepresentation is caused by the jury-selection process—to establish "systematic exclusion."

24

The District Court further stated that "most of these practices have been specifically authorized by the Second Circuit." A. 166-67 (citing *Schanbarger* and *United States v. Young*, 822 F.2d 1234 (2d Cir. 1987)). But both *Schanbarger* and *Young* erroneously imported (from equal protection jurisprudence) an intent-to-discriminate requirement into fair-cross-section analysis, as this Court (and others) have since recognized. *See*, e.g., *Biaggi*, 909 F.2d at 677-78 (holding that, despite "arguably" confusing language in *Young*, "discriminatory intent is not an element of a Sixth Amendment 'fair cross-section' claim"); *Reyes*, 934 F. Supp. at 557-58 (holding, with the Government's consent, that *Biaggi* controls over *Schanbarger*).

For these reasons, the court ruled, Appellant has not established a prima facie fair-cross-section violation under either the Constitution or the JSSA.

**B.      Appellant has established at least a prima facie violation of his constitutional and statutory right to a grand jury chosen from a fair cross-section of the community.**

Both the Constitution and the JSSA require that a federal grand jury be chosen from a fair cross-section of the community. *See, e.g.,* 28 U.S.C. § 1861 ("It is the policy of the United States that all litigants in

25

federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."); *Murphy v. Johnson*, 205 F.3d 809, 818 (5th Cir. 2000) ("[O]ur precedent dictate[s] that the fair cross-section requirement of the Sixth Amendment applie[s] to the selection process for grand juries."); *United States v. Osorio*, 801 F. Supp. 966, 974 (D. Conn. 1992) (holding that the Sixth Amendment's fair-cross-section requirement applies, of its own force, to grand juries).

To establish a prima facie violation of this right, Appellant must meet *Duren*'s three-part test by showing that: "(1) the group claimed to be excluded is distinctive in the community, (2) the representation of the group in the jury pool is not fair and reasonable in relation to the number of members of the group in the community, and (3) the underrepresentation is the result of systematic exclusion of the group in the jury selection process." *United States v. Jackman*, 46 F.3d 1240, 1245-46 (2d Cir. 1995) (citing *Duren,* 439 U.S. at 364). This test also applies to fair-cross-section challenges under the JSSA. *See, e.g., United States v. LaChance*, 788 F.2d 856, 864 (2d Cir. 1986). "Once the

26

defendant has established a prima facie case, the burden shifts to the

government to show "that a significant state interest be manifestly and

primarily advanced by those aspects of the jury-selection process ... that

result in the disproportionate exclusion of a distinctive group." *Duren*,

439 U.S. at 367-68.

Crucially, Appellant "need not prove discriminatory intent on the

part of those constructing or administering the jury selection process."

*Jackman*, 46 F.3d at 1246 (citing *Duren*, 439 at 368 n.26; *Alston v.

Manson*, 791 F.2d 255, 258 (2d Cir. 1986)). Thus, it is irrelevant, for

fair-cross-section purposes, whether a particular jury-selection practice

is malicious or "benign" (in the sense that it was not intended or

designed to underrepresent or exclude a particular group). All that

matters is whether the practice produces venires that fairly represent

the community. If it does not, the fair-cross-section requirement has

been violated, and any resulting indictment must be dismissed. *See* 28

U.S.C. § 1867(d). As this Court has held, "While the equal protection

clause of the fourteenth amendment prohibits underrepresentation of

minorities in juries by reason of intentional discrimination, [t]he sixth

amendment is stricter because it forbids any substantial

27

underrepresentation of minorities, regardless of ... motive." *United States v. Gelb*, 881 F.2d 1155, 1161 (2d Cir. 1989); *see also Smith v. Commonwealth*, 649 N.E.2d 744, 746 (Mass. 1995) ("[T]he inquiry does not focus on the jury selection process itself, but instead focuses on the result of the process using an analysis of the process. Thus, if exclusion of a particular group arises as a result of the system by which potential jurors are chosen, that exclusion is 'systematic.'").

Courts, including this Court on occasion, get confused on this point. *See, e.g., Schanbarger*, 77 F.3d at 1424 (stating in dictum that "absent positive evidence that some groups have been hindered in attempting to register to vote, a jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of Equal Protection"). This statement was dictum because *Schanbarger* was a civil case to which the Sixth Amendment did not even apply. As discussed, the District Court here erroneously relied on *Schanbarger* and other misguided cases. A. 166-67; *see generally* Nina W. Chernoff, *Wrong About the Right: How Courts Undermine the Fair Cross-Section*

28

*Guarantee by Confusing it with Equal Protection*, 64 Hastings L.J. 141, 194-96 (2012).

Nor need Appellant show prejudice from a fair-cross-section violation. *See, e.g., United States v. Rodriguez-Lara*, 421 F.3d 932, 940-41 (9th Cir. 2005) ("The selection of a grand or petit jury in violation of either the equal protection or the fair cross-section guarantee is structural error that entitles a defendant to relief without a demonstration of prejudice.") (citing, *inter alia*, *Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986) (plurality and majority portions)), *overruled on other grounds by United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir. 2014) (en banc).

Contrary to the District Court's ruling, Appellant has satisfied all three prongs of the *Duren* test, thus requiring vacatur and a remand for further consideration of Appellant's motion to dismiss.

## 1. Blacks and Hispanics are "distinctive" groups in the community.

Preliminarily, it is undisputed that Blacks and Hispanics constitute "distinctive" groups under *Duren*. *See Rioux,* 97 F.3d at 654 ("Blacks and Hispanics are unquestionably 'distinctive' groups for the

29

purposes of a fair-cross-section analysis.*"); Jackman*, 46 F.3d at 1246
("There is little question that both Blacks and Hispanics are 'distinctive'
groups in the community for purposes of th[e *Duren*] test."). Thus, the
first prong of the *Duren* test is met.

> **2.  The representation of Blacks and Hispanics in venires
>      from which grand juries are selected in the Southern
>      District of New York is not "fair and reasonable."**

The second prong of *Duren* asks whether "either or both of these
two 'distinctive' groups are 'significant[ly] underrepresent[ed]' in the
jury selection process." *Jackman*, 46 F.3d at 1246 (quoting *Biaggi*, 909
F.2d at 677). The District Court assumed that they are (A. 162-63), and
rightly so. By any statistical measure, the grand jury that indicted
Slaughter was drawn from a qualified wheel that underrepresents
Blacks and Hispanics by constitutionally unacceptable margins.

Courts have employed different analytic methods to determine
whether there has been significant underrepresentation of minority
groups in the jury-selection process. *See, e.g., Hernandez-Estrada*, 749
F.3d at 1160-64; Peter A. Detre, *A Proposal for Measuring
Underrepresentation in the Composition of the Jury Wheel*, 103 Yale
L.J. 1913, 1918 (1994). These methods include (1) the "absolute

disparity"/"absolute numbers" test; (2) the "comparative disparity" test; and (3) "statistical decision theory" (also known as "standard deviation analysis"). *Hernandez-Estrada*, 749 F.3d at 1160.

The Supreme Court has not decided which method (or combination of methods) should be used. *See Berghuis,* 559 U.S. at 329 ("[N]either *Duren* nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools."). This Court has used various methods for evaluating claims of "significant underrepresentation," but it appears to prefer the "absolute disparity"/"absolute numbers" method in most cases. *See Rioux,* 97 F.3d at 655.

Here, as discussed above, and as the District Court recognized, application of this method reveals significant and troubling underrepresentation of Blacks and Hispanics. Specifically, for the Manhattan Qualified Wheel from which Appellant's grand jury was selected,[6] the defense demonstrated the following absolute disparities:

---

[6] Focusing on the Manhattan Qualified Wheel is appropriate because that is the pool from which venires are actually created. *See, e.g., United States v. Pepe,* 747 F.2d 632, 649 (11th Cir. 1984) (*"*The relevant comparison for sixth amendment fair cross-section purposes is the

- The Absolute Disparity for Blacks is 5.11% underrepresentation (21.19% minus 16.08%). A. 52 (¶ 33).

- The Absolute Disparity for Hispanics is 9.03% underrepresentation (28.44% minus 19.41%). A. 52 (¶ 34). Using the more recent American Community Survey 1-Year numbers yields an Absolute Disparity of 9.88%. A. 52 (¶ 35).

As the District Court acknowledged (A. 162), these levels of underrepresentation are "substantially greater" than the levels this Court historically has been willing to tolerate. In *Biaggi*, for example, this Court, relying on the absolute disparity test, considered a disparity of 3.6% for Blacks and 4.7% for Hispanics. 909 F.2d at 677. The district court there found that the "addition of two Blacks and three Hispanics to a venire of a typical size would be required to eliminate underrepresentation." *Id.* at 678. While this Court found no fair-cross-section violation, it noted that "the facts of this case press the . . . 'absolute numbers' approach to its limit, and [that it] would find the

---

comparison between the percentage of the 'distinctive group' on the qualified wheel and the percentage of the 'distinctive group' among the population eligible for jury service.").

Sixth Amendment issue extremely close if the underrepresentation had resulted from any circumstance less benign than use of voter registration lists." *Id.* The absolute disparities at issue here—5.11% and 9.03% for Blacks and Hispanics, respectively, in the Manhattan Qualified Wheel—well exceed the tolerable outer "limit" suggested in *Biaggi.* They also reveal a steady and troubling trend towards increasingly less fair representation in the Southern District of New York. And there is no reason to believe the disparities will ebb without this Court's intervention.

The other common methods of measuring disparity confirm that Blacks and Hispanics are significantly underrepresented. "Statistical decision theory ('SDT') calculates probabilities and measures the likelihood that underrepresentation could have occurred by sheer chance. Under this method, if one can determine that it is statistically improbable that the jury pool resulted from random selection, then there is an imperfection in the jury selection system." *Rioux*, 97 F.3d at 655. At least one state supreme court has adopted SDT as the preferred method of calculating jury underrepresentation. *See State v. Lilly*, 930 N.W.2d 293, 304 (Iowa 2019) (holding that the threshold for

33

establishing systematic underrepresentation should be one standard deviation after rejecting the absolute disparity and comparative disparity methods).

Applying SDT, Appellant's expert found that the percentage of Blacks and Hispanics in the Manhattan Qualified Wheel differs from the percentage of Blacks and Hispanics in the relevant population by more than 3 standard deviations. A. 53 (¶¶ 44-45). He concluded that the underrepresentation of both groups "is not the result of random factors, chance, or luck, but is the result of a systematic practice that underrepresents [them]." *Id.*

The significance of the disparity is further confirmed by the "comparative disparity method," which "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Rioux*, 97 F.3d at 655. "Comparative disparity is calculated by dividing the 'absolute disparity' of a group . . . by the group's percentage of the population, and then multiplying by 100%." *Id.*

Here, the data reveals the following comparative disparities for the Manhattan Qualified Wheel:

34

- The Comparative Disparity for Blacks is 24.12% underrepresentation (5.11% divided by 21.19%). That is, nearly one-quarter of the expected number of Blacks in the Manhattan Qualified Wheel are "missing." A. 52 (¶ 39).

- The Comparative Disparity for Hispanics is 31.75% underrepresentation (9.03% divided by 28.44%). A. 52 (¶ 40). This means that nearly one-third of the expected number of Hispanic persons in the Manhattan Qualified Wheel are "missing." *Id.* Using the more recent American Community Survey 1-Year numbers results in a Comparative Disparity of 33.73%. *Id.* (¶ 41).

Thus, regardless of the method of analysis, Blacks and Hispanics are significantly underrepresented in the Manhattan Qualified Wheel. As Appellant's expert averred, each method shows a "statistically significant"—and growing—underrepresentation of Blacks and Hispanics in the grand jury pool. A. 49 (¶¶ 6-7).

Further, the significant and persistent underrepresentation of Blacks and Hispanics is matched by a significant *over*representation of Whites in the Manhattan Qualified Wheel. Whites are overrepresented

35

in the jury wheel by 7.99%. *See* A. 51 (¶¶ 23, 28). Individuals identifying as Black or Hispanic, considered together, are underrepresented by a striking 12.70%. A. 52 (¶ 36). The jury pool cannot reflect a fair cross-section of the community when people of color are significantly underrepresented while Whites are overrepresented. This imbalance is particularly troubling given the disproportionately negative outcomes Blacks and Hispanics face in the criminal justice system. *See, e.g.*, Amnesty Int'l, *Racism and the Administration of Justice* 10 (2001) ("Various studies indicate that members of minorities (especially Blacks and Hispanics) may be disproportionately subject to adverse treatment throughout the criminal justice process."); Samuel R. Sommers & Satia A. Marotta, *Racial Disparities in Legal Outcomes: On Policing, Charging Decisions, and Criminal Trial Proceedings*, 1 Policy Insights from the Behavioral and Brain Sciences 103 (October 2014), https://journals.sagepub.com/doi/pdf/10.1177/2372732214548431.

In summary, the District Court's assumption was correct: the statistical evidence demonstrates that Blacks and Hispanics are not fairly represented in the Southern District's grand jury venires, thus satisfying prong 2 of the *Duren* prima facie framework.

36

3.  **The underrepresentation of Black and Hispanics is attributable to the systematic exclusion of these groups in the jury-selection process.**

Appellant has also satisfied the third and final *Duren* prong by demonstrating that the underrepresentation of Blacks and Hispanics is "due to systematic exclusion of the[se] groups[s], in the jury-selection process." *Duren*, 439 U.S. at 364.

"[S]ystematic exclusion" occurs "when the underrepresentation is due to the system of jury selection itself, rather than external forces." *Rioux*, 97 F.3d at 658. Systematic exclusion can be demonstrated in at least two ways. First, as discussed below, the defendant can present evidence showing that substantial underrepresentation of a minority group occurred over a significant period. Second, the defendant can establish systematic exclusion by identifying the existence of a practice or design choice that, while facially neutral, has a readily articulable effect with severe implications for the representativeness of jury pools. Here, Appellant has proven systematic exclusion in both ways.

### a. A long period of significant underrepresentation is sufficient to establish "systematic exclusion."

Systematic exclusion can be demonstrated "by showing that substantial underrepresentation of distinctive groups occurred over a significant time period." *United States v. Reyes*, 934 F. Supp. 553, 557 (S.D.N.Y. 1996); *see also Barber v. Ponte*, 772 F.2d 982, 989 (1st Cir. 1985) ("A large discrepancy occurring over a sustained period of time where there is an opportunity for arbitrary selection is sufficient to demonstrate that the exclusion of the underrepresentation is systematic—that is, inherent in the particular jury selection process utilized."); *United States v. Test*, 550 F.2d 577, 586 (10th Cir. 1976) ("[P]roof that a cognizable group had been totally excluded from jury service over a substantial period of time or had received only 'token representation' has been held sufficient to raise an inference of discrimination and systematic exclusion."); *Swain v. Alabama*, 380 U.S. 202, 226 (1965) ("[P]roof that Negroes constituted a substantial segment of the population[,] ... that some Negroes were qualified to serve as jurors, and that none had been called for jury service over an extended period of time ... constitute(s) prima facie proof of the systematic

38

exclusion of Negroes from jury service.") (quoting *Hernandez v. Texas*, 347 U.S. 475, 480 (1954)).

The District Court ruled that the long period of substantial Black and Hispanic underrepresentation, as alleged in this case, is not sufficient to show "systematic exclusion." This ruling is inconsistent with *Duren* itself. There, the Supreme Court held that the consistent underrepresentation of women for "nearly a year" was sufficient to establish "systematic exclusion":

> [I]n order to establish a prima facie case, it was necessary for petitioner to show that the underrepresentation of women, generally and on his venire, was due to their systematic exclusion in the jury-selection process. *Petitioner's proof met this requirement. His undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized.*

439 U.S. at 366 (emphasis added). Thus, *Duren* makes clear, contrary to the District Court's ruling, that "systematic exclusion" can be shown "by identifying a large discrepancy over time such that the system must be said to bring about the underrepresentation." *Savage,* 970 F.3d at 259 (citations omitted).

The District Court reasoned that allowing a defendant to establish "systematic exclusion" based on significant underrepresentation for a long period would improperly collapse prongs 2 and 3 of the *Duren* test. *See* A. 165. This is untrue. "Significant underrepresentation" does not examine the time frame: it can be established by showing, typically through statistical analysis, that the venire from which the defendant's grand jury was chosen significantly underrepresented a distinctive group in the community. In *Duren*, for instance, the Supreme Court decided the second prong based solely on statistical evidence. *See* 439 U.S. at 364.

Systematic exclusion, in contrast, requires more: the defendant must show that the underrepresentation, even if significant, was not a one-time occurrence, but persisted over a substantial period, thus giving rise to a reasonable inference that the exclusion is attributable to choices made and practices adopted by the government officials who design and administer the jury-selection process itself, not a random factor. The "systematic exclusion" prong thus has a temporal element. It can be shown by proof of a "substantial under-representation over a significant period of time." *Ramseur v. Beyer*, 983 F.2d 1215, 1234

40

(3d Cir.1992). And it mandates that the "discrepancy occurred not just occasionally" but repeatedly for some period. *Duren*, 439 U.S. at 366; *see also United States v. Weaver*, 267 F.3d 231, 241 (3d Cir. 2001) ("Following *Duren*'s approach, the strength of the evidence should be considered under the second prong, while the nature of the process and the length of time of underrepresentation should be considered under the third.").

Thus, inferring "systematic exclusion" from a long period of significant underrepresentation does not conflate prongs 2 and 3 of the *Duren* test. A defendant who shows systematic exclusion by establishing underrepresentation over a long period has not necessarily satisfied prong 2 of *Duren*; he or she must still show significant underrepresentation in his specific case. Conversely, a defendant who meets prong 2 by showing "substantial underrepresentation" does not necessarily establish prong 3; he or she must still show that the underrepresentation is "systematic," rather than random. Accordingly, a defendant who shows significant underrepresentation over a long period, including in his own case, has not conflated prongs 2 and 3 of the *Duren* test—he has satisfied them. *See also United States v. Smith*,

41

No. CR 19-324 (BAH), 2022 WL 425059, at *26 (D.D.C. Feb. 11, 2022)
(holding that "systematic exclusion" might be demonstrable even in the
absence of a "readily identifiable" cause if the data show that a
particular juror-selection practice produces underrepresentation over
an extended period).

Here, the underrepresentation of Blacks and Hispanics is
significant and has grown worse over time. For example, a ten-year
pattern shows underrepresentation of Hispanics increasing every year
starting with .11% in 2011 and culminating with 9.07% in 2019.
A. 143-44 (¶¶ 67-68). This consistent and increasing discrepancy over
many years "manifestly indicates that the cause of the
underrepresentation [is] systematic[.]" *Duren*, 439 U.S. at 366.

The systematic nature of this exclusion is reinforced by the fact
that courts began recognizing the disparities at issue as early as 1996.
In *Reyes*, for example, then-Judge Scheindlin analyzed the Southern
District of New York's jury-selection system in addressing the
defendant's claim that Black and Hispanic people were
unconstitutionally underrepresented in the pool from which the grand
jury was drawn. 934 F. Supp. at 555. At that time, the numbers

42

revealed (depending on the methodology employed) a range from 2.17% disparity for Blacks and 1.93% disparity for Hispanics to 4.03% disparity for Blacks and 3.42% disparity for Hispanics. *Id.* at 565-66. The court held that these absolute disparities, which are much lower than the disparities at issue here, did not violate the Sixth Amendment. *Id.* at 566. But the court cautioned that "a finding that the above disparities are not unconstitutional is not the same as an endorsement of such discrepancies." *Id.* Moreover, the court stated that "serious consideration should be given to amending the jury selection procedures in the Southern District of New York." *Id.* Yet, in 2023, the relevant features of the system have remained the same, and the discrepancies have only worsened.

This failure to modify a system that has been known, since at least 1996, to produce underrepresentation, is important. It refutes the notion that the underrepresentation is random—or caused by external events akin to a hurricane—and supports instead a ruling that the disparity is a product of the jury-selection process itself. *See, e.g.*, *Jackman*, 46 F.3d at 1247 (holding that the facts there were "far less than benign" given that the underrepresentation in the qualified jury

43

wheel "continued for more than a year after disclosure of constitutional infirmities in the selection process"). Indeed, as discussed, federal districts around the country have taken steps to address the very flaws in their jury plans that also plague the system here—demonstrating that they are not "external forces" beyond the control of the jury-selection process, but systematic choices made by governmental actors responsible for identifying and summoning jurors in the Southern District. *See supra*, pp. 16-18.

Because the system's creation of problematic disparities has been known for more than 25 years since the decision in *Reyes*, with no curative steps taken, the underrepresentation challenged here can only be described as "systematic exclusion."

**b.      Appellant has also shown that the underrepresentation of Blacks and Hispanics results from specific practices within the grand-jury selection process.**

In any event, Appellant did not rely solely on the long persistence of significant underrepresentation of Blacks and Hispanics in the relevant jury pool. He also identified specific causes for the underrepresentation—causes rooted in the jury-selection process.

44

Contrary to the District Court's view, these causes cannot be dismissed as "external forces" akin to inclement weather. *See* A. 164; *cf. Little Bear*, 583 F.2d at 414-15; *Jones*, 2006 WL 278248, at *3.

As the defense demonstrated below, the Southern District of New York has decided for decades to rely on voter registration lists alone, to update the jury wheels only once every four years, and to refrain from following up on (or re-issuing) jury-qualification questionnaires that are not returned (or are returned as undeliverable), among other decisions. These are *choices* made by those who create and administer the jury-selection system. Thus, they are part of the jury-selection process. They are not "external forces" analogous to a natural disaster like a hurricane. *See, e.g., Weaver*, 267 F.3d at 244-45 (stating that a defendant may demonstrate "systematic exclusion" "if the use of voter registration lists over time [had] the effect of sizeably underrepresenting a particular class or group on the jury venire").

To be clear, Appellant is not claiming that the jury-selection system must—or even could—ensure that Blacks or Hispanics register to vote in greater numbers, or that they return a higher percentage of jury-qualification questionnaires, or that they reside in a particular

45

demographic area. These are all individual decisions for private citizens to make. But the jury system *is* required, by the Constitution and the JSSA, to ensure that whichever jury-selection procedures are adopted produce venires that fairly represent the community. The failure to do so cannot be characterized as an "external factor" beyond the constraints of the Constitution and the Jury Selection Act. Because the Southern District of New York's jury plan has long produced grand juries that significantly and systematically underrepresent Blacks and Hispanics, including the grand jury that indicted Appellant, his conviction cannot stand.

Finally, a ruling by this Court in Appellant's favor is vitally important. The fair-cross-section requirement is a central pillar of the justice system. It is crucial to the goals of the jury system that the pool of potential jurors reflects the community's demographics. "The American tradition of trial by jury . . . necessarily contemplates an impartial jury drawn from a cross-section of the community." *Thiel v. S. Pac. Co.*, 328 U.S. 217, 220 (1946). Thus, "those eligible for jury service are to be found in every stratum of society." *Ballard v. United States*, 329 U.S. 187, 193 (1946). Unrepresentative juries undermine

these ideals and, inevitably, the public's confidence in the judicial system. *See Taylor v. Louisiana*, 419 U.S. 522, 530 (1975) ("Community participation [is]... critical to public confidence in the fairness of the criminal justice system."); *Smith v. Texas*, 311 U.S. 128, 130 (1940) (noting that the systematic exclusion from jury service of distinctive groups is "at war with our basic concepts of a democratic society and a representative government").

***

In sum, Appellant has established at least a prima facie fair-cross-section violation under *Duren*. He has demonstrated not only that Blacks and Hispanics are significantly underrepresented in the pools from which grand juries in the Southern District of New York are selected, but that the underrepresentation results from systematic features of the jury-selection process, not random events or "external forces." Accordingly, this Court should vacate the District Court's decision and judgment, and remand for further consideration of Appellant's motion to dismiss.

## CONCLUSION

For these reasons, this Court should vacate the judgment of conviction, remand for further proceedings, and grant any alternative or additional relief that may be just and appropriate.

Respectfully submitted,

/s/
Edward S. Zas

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8742
Edward_Zas@fd.org

*Counsel for Ellva Slaughter*

48

## CERTIFICATE OF COMPLIANCE

1.    This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and 32(e) and Local Rule 32(a)(4)(A) because it contains 8,939 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with 14 characters per inch in Century Schoolbook type style.

Dated:    New York, New York
            June 7, 2023

                                     /s/
                                Edward S. Zas

49

## CERTIFICATE OF SERVICE

I certify that, on June 7, 2023, I caused this Brief to be filed with the Court's Appellate Case Management System (ACMS), which will effect service on all counsel of record.

Dated:    New York, New York
           June 7, 2023


                    /s/
                    Edward S. Zas