23-6055
*United States v. Slaughter*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2023

(Argued: February 16, 2024     Decided: August 8, 2024)

Docket No. 23-6055

UNITED STATES OF AMERICA,

*Appellee,*

–v.–

ELLVA SLAUGHTER,

*Defendant-Appellant.*

Before:     JACOBS, ROBINSON, and NATHAN, *Circuit Judges.*

Defendant-Appellant Ellva Slaughter appeals from a January 13, 2023 judgment of the United States District Court for the Southern District of New York (Failla, *J.*) convicting him of illegally possessing a firearm while knowing he had previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).

On appeal, Slaughter challenges the district court's denial of his motion to dismiss the indictment on the ground that the SDNY's jury

selection plan systematically underrepresents Black and Hispanic or Latino people in violation of his right to a grand jury drawn from a fair cross-section of the community under the Sixth Amendment and the Jury Selection and Service Act of 1968.  The district court assumed without deciding that the underrepresentation of Black and Hispanic or Latino people on SDNY venires is significant, but denied Slaughter's motion because he failed to establish the underrepresentation is due to systematic exclusion in the District's jury selection process.

Applying the framework set forth in *Duren v. Missouri*, 439 U.S. 357 (1979), we assume without deciding that the underrepresentation of Black and Hispanic or Latino people on SDNY venires is significant, but conclude that Slaughter has not met his burden of proving systematic exclusion.  We therefore **AFFIRM**.

---

DANIELLE SASSOON (Matthew Weinberg & Stephen J. Ritchin, *on the brief*) *for* Damian Williams, United States Attorney for the Southern District of New York, NY.

EDWARD S. ZAS, Federal Defenders of New York, Inc., New York, NY, *for Defendant-Appellant*.

---

ROBINSON, *Circuit Judge*:

Defendant-Appellant Ellva Slaughter appeals from a January 13, 2023 judgment of the United States District Court for the Southern District of New York (Failla, *J.*) convicting him of illegally possessing a firearm while knowing he had previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).

On appeal, Slaughter challenges the district court's denial of his motion to dismiss the indictment on the ground that the SDNY's jury selection plan systematically underrepresents Black and Hispanic or Latino people in violation of his right to a grand jury drawn from a fair cross-section of the community under the Sixth Amendment and the Jury Selection and Service Act of 1968. The district court assumed without deciding that the underrepresentation of Black and Hispanic or Latino people on SDNY venires is significant, but denied Slaughter's motion on the ground that he failed to establish the underrepresentation is due to systematic exclusion in the District's jury selection process.

Applying the framework set forth in *Duren v. Missouri*, 439 U.S. 357 (1979), we assume without deciding that the underrepresentation of Black and Hispanic or Latino people on SDNY venires is significant, but conclude that Slaughter has not met his burden of proving systematic exclusion. We therefore **AFFIRM**.

## BACKGROUND

In 2021, a grand jury in the Southern District of New York in Manhattan charged Ellva Slaughter with one count of illegally possessing a firearm while knowing he had previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).

Slaughter moved to dismiss the indictment, arguing that the SDNY's jury selection plan systematically underrepresents Black and Hispanic or Latino people in violation of his right to a grand jury drawn from a fair cross-section of the community under the Sixth Amendment and the Jury Selection and Service Act of 1968 (the "JSSA"), 28 U.S.C. § 1861, *et seq.*[1]

## I.    The SDNY's Jury Selection Plan

The JSSA requires each federal district court to "devise and place into operation a written plan for random selection of grand and petit jurors."  28 U.S.C. § 1863(a).  The plan must be approved by a reviewing panel consisting of (1) members of the judicial council of the circuit and (2) either the chief judge or another active judge of the district whose plan is being reviewed.  *Id.*  This panel reviews the plan to ensure it complies with the provisions of the JSSA.  *Id.*  A district may modify its plan at any time at the direction of the reviewing panel or on its own initiative, subject to approval by the panel.  *Id.*

The SDNY adopted its first jury selection plan in accordance with the JSSA on July 26, 1983.  Since then, the SDNY has amended its plan eight times with the

---

[1] Slaughter also invoked his right to equal protection under the Fifth Amendment in challenging the jury selection process, but he did not devote any argument to this issue in his briefs before the district court or this Court.  Accordingly, we deem his Fifth Amendment challenge abandoned. *See United States v. Joyner*, 313 F.3d 40, 44 (2d Cir. 2002) ("[A]n argument not raised on appeal is deemed abandoned . . . .").

approval of the reviewing panel: on January 20, 1984; December 15, 1988; June 27, 1996; June 24, 1999; November 29, 2000; March 20, 2002; January 29, 2009; and September 27, 2023.

At issue here is the January 29, 2009 Amended Plan for the Random Selection of Grand and Petit Jurors (the "Plan"). The Plan uses voter registration lists as the exclusive source of names for prospective jurors in the SDNY, omitting inactive voters.[2] The process begins with the Clerk of Court randomly and proportionately selecting from the voter registration lists of each county a number

---

[2] The JSSA expressly approves of voter registration lists as a source of names for prospective jurors, and provides that a district's plan "shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862." 28 U.S.C. § 1863(b)(2). The other districts in this Circuit compile jury lists from numerous sources in addition to voter registration lists. *See* United States District Court for the Eastern District of New York Jury Selection Plan (as amended Jan. 31, 2023), https://img.nyed.uscourts.gov/files/local_rules/juryplan.pdf [https://perma.cc/ZHJ3-ETW4] (voter registration lists and DMV records); United States District Court for the Western District of New York Jury Selection Plan (as amended Apr. 30, 2018), https://www.nywd.uscourts.gov/sites/nywd/files/2018%20Jury%20Plan%20-%20FINAL.pdf [https://perma.cc/S6J9-VHCL] (voter registration lists, DMV records, records from the Department of Taxation and Finance, records from the Department of Labor, and social services records); United States District Court for the Northern District of New York Jury Selection Plan (as amended Nov. 9, 2021), https://www.nynd.uscourts.gov/sites/nynd/files/general-ordes/GO24_5.pdf [https://perma.cc/FQP9-TZYB] (voter registration lists, DMV records, and records from the Department of Taxation and Finance); United States District Court for the District of Connecticut Jury Selection Plan (as amended Apr. 17, 2023), https://www.ctd.uscourts.gov/sites/default/files/District-of-Connecticut-Jury-Plan.pdf [https://perma.cc/M55S-95FM] (voter registration lists, DMV records, and records from the Department of Revenue Services); United States District Court for the District of Vermont Jury Selection Plan (as amended Mar. 27, 2019), https://www.vtd.uscourts.gov/sites/vtd/files/JuryPlan.pdf [https://perma.cc/W8RG-EVNT] (voter registration lists and DMV records).

of prospective jurors deemed sufficient to cover a four-year period.  From these names, the District constructs two "master" jury wheels: (1) the Manhattan Master Wheel, containing active voters from New York, Bronx, Westchester, Putnam, and Rockland Counties; and (2) the White Plains Master Wheel, containing active voters from Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess Counties.  The District empties and refills the Master Wheels once every four years.

At least once a year, the Clerk of Court randomly selects names from the Master Wheels to meet the anticipated demand for grand and petit jurors over the next six months.  The District sends these individuals questionnaires regarding their qualifications to sit as jurors, such as whether they understand English and whether a mental or physical impairment prevents them from serving. Prospective jurors must complete and return their questionnaire within ten days. If a person does not respond or their questionnaire is returned as undeliverable, the SDNY does not follow up.

Those who return the questionnaire and are otherwise qualified to serve fill the "qualified" jury wheels: the Manhattan Qualified Wheel and the White Plains

Qualified Wheel.[3]  The Qualified Wheels must contain at least 500 names at all times.  It is from these Qualified Wheels that the Clerk of Court periodically and randomly selects individuals to summon for service as grand or petit jurors.

Effective October 5, 2023—after the indictment at issue in this case—the SDNY amended its plan, reducing the interval for refilling the master jury wheels from four to two years.  Other than a few non-substantive updates, the plan remains otherwise unchanged from its 2009 version.

## II.    Slaughter's Motion to Dismiss the Indictment

Slaughter argued that the Plan systematically underrepresents Black and Hispanic or Latino people in violation of his constitutional and statutory rights to a grand jury selected from a fair cross-section of the community.  His challenge followed the framework set forth in *Duren v. Missouri*, 439 U.S. 357 (1979).

First, Slaughter asserted—and the government did not contest—that Black and Hispanic or Latino people are distinctive groups in the community.  Second, he submitted an expert report showing, among other things, that while Black

---

[3] The Qualified Wheels contain the same county breakdowns as the Master Wheels.  This is the stage of the process where the District accounts for the three overlapping counties: Westchester, Putnam, and Rockland.  According to the Plan, jurors drawn for service from Westchester, Putnam, and Rockland Counties shall be "divided between the Manhattan and White Plains Qualified Wheels."  App'x 43.  The division of jurors from each of those counties "shall reasonably reflect the relative number of registered voters in each county within the respective Master Jury Wheels."  *Id.*

people comprise 21.19% of the jury eligible population in the SDNY, only 16.08% of the people on the Manhattan Qualified Wheel are Black.  Likewise, while Hispanic or Latino[4] people comprise 28.44% of the relevant population, only 19.41% of those on the Manhattan Qualified Wheel are Hispanic or Latino.  The government's expert presented similar figures.  Based on these and other statistics, Slaughter argued that Black and Hispanic or Latino people are significantly underrepresented in SDNY venires.

Third and finally, Slaughter alleged that the underrepresentation is the result of systematic exclusion in the SDNY's jury selection process.  He argued that the persistence of disparities over time, standing alone, demonstrates that underrepresentation is due to systematic exclusion rather than external forces outside the SDNY's control.  Additionally, Slaughter's expert identified numerous aspects of the SDNY's Jury Selection Plan as "systematic factors of under-representation," App'x 58, three of which Slaughter continues to press on appeal: (1) reliance on voter registration lists as the exclusive source of names for

---

[4]  The parties' experts recognize Hispanic and Latino people as distinct groups, although they often refer to the groups collectively as "Hispanic."  The US Census Bureau data relied upon by each expert uses "Hispanic or Latino" to refer to "a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race."  *Why We Ask Questions About…Hispanic or Latino Origin*, United States Census Bureau (last accessed Apr. 11, 2024),          https://www.census.gov/acs/www/about/why-we-ask-each-question/ethnicity/ [https://perma.cc/H5UN-FK42].  Because the parties' experts identified the relevant demographic group as including Hispanic or Latino people, we do the same throughout this opinion.

prospective jurors, (2) updating the Master Wheels only once every four years, and (3) refusal to follow up on jury qualification questionnaires that are not returned or returned as undeliverable. Slaughter's expert asserted that each of these factors causes underrepresentation of Black and Hispanic or Latino people in SDNY venires, although he provided scant data to back that up.

The government denied the significance of the disparities and rejected Slaughter's argument that persistence of disparities over time may suffice to show systematic underrepresentation. It also countered Slaughter's expert report with its own, arguing that any underrepresentation is not systematic but the product of factors external to the jury selection process.

The district court denied Slaughter's motion in an oral ruling. The court assumed without deciding that Slaughter "met his burden of showing substantial or significant underrepresentation . . . ." App'x 163. However, it rejected Slaughter's argument that the disparities are the result of systematic exclusion in the SDNY's jury selection process, finding: (1) Slaughter's expert put forth no evidence that the identified practices actually contribute to disparities; (2) "most of [the challenged] practices have been specifically authorized by the Second Circuit"; and (3) any disparities are due to external forces outside the SDNY's control, like people moving, aging, or deciding not to respond to qualification

questionnaires.  *Id.* at 165–68.  The court likewise rejected Slaughter's assertion that the persistence of disparities over time, standing alone, may prove systematic exclusion.  Substantially for these reasons, the court concluded that Slaughter had failed to establish a constitutional or statutory fair cross-section violation.

## III.    Remaining Proceedings

Following a bench trial on stipulated facts, the court found Slaughter guilty of violating 18 U.S.C. § 922(g)(1) and sentenced him to time served plus one month. In this timely appeal, he challenges only the district court's ruling on his motion to dismiss the indictment.  Slaughter completed his term of imprisonment on February 6, 2024, and was thereafter deported to Jamaica.[5]

## DISCUSSION

## I.    Standard of Review

This fair cross-section challenge presents a mixed question of law and fact. We review the district court's factual findings for clear error and its legal

---

[5]  The government moves to dismiss this appeal as moot on the ground that Slaughter has completed the carceral portion of his sentence, has been removed from the country, and, on the basis of prior unrelated convictions, is inadmissible.  We deny the motion because the appeal is not moot.  Here, Slaughter remains subject to the special assessment fee.  *Kassir v. United States*, 3 F.4th 556, 566 (2d Cir. 2021) ("A special assessment fee is a sufficient basis for a defendant to maintain a concrete stake in challenging a conviction on direct appeal.").  Slaughter's removal also did not relieve him of his term of supervised release.  *United States v. Roccisano*, 673 F.3d 153, 157 (2d Cir. 2012).  Slaughter is thus entitled to a ruling on the merits of his challenge.  *See United States v. Atilla*, 966 F.3d 118, 123 (2d Cir. 2020) (direct appeal challenge to conviction not moot where defendant had completed carceral sentence and been removed).

conclusions without deference. *United States v. Selioutsky*, 409 F.3d 114, 119 (2d Cir. 2005) ("We review issues of law *de novo*, issues of fact under the clearly erroneous standard, [and] mixed questions of law and fact either *de novo* or under the clearly erroneous standard depending on whether the question is predominantly legal or factual. . . ." (citations omitted)); *see also United States v. Rioux*, 97 F.3d 648, 654–59 (2d Cir. 1996) (conducting what appears to be plenary review of a fair cross-section claim on undisputed facts). Specifically, we review for clear error the district court's determination that Slaughter's expert put forth no evidence that the challenged SDNY practices cause or contribute to disparities.

## II.    The Fair Cross-Section Right

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial[] by an impartial jury of the State and district wherein the crime [was] committed . . . ." U.S. Const. amend. VI. In the nineteenth century, the Supreme Court struck down as unconstitutional the express exclusion of Black citizens from juries. *See Strauder v. West Virginia*, 100 U.S. 303, 310 (1879). But the practical exclusion from jury service of Black people, women, and other groups persisted well into the twentieth century.

In an effort to address this systematic exclusion, and recognizing that "this Nation has stated and restated its commitment to the goal of the representative

11

jury without making any significant effort to insure that this goal is attained," Congress enacted the Jury Selection and Service Act of 1968.  S. Rep. No. 90-891, at 9–11 (1967).  The JSSA provides: "It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  28 U.S.C. § 1861.  It further states that "[n]o citizen shall be excluded from service as a grand or petit juror . . . on account of race, color, religion, sex, national origin, or economic status."  28 U.S.C. § 1862.  To that end, the JSSA requires each federal district court to adopt a plan for the random selection of grand and petit jurors that is "designed to achieve" the objectives of Sections 1861 and 1862.  28 U.S.C. § 1863(a).

In *Taylor v. Louisiana*, the Supreme Court formally recognized the fair cross-section requirement as fundamental to the right to an impartial jury guaranteed by the Sixth and Fourteenth Amendments.  419 U.S. 522, 530 (1975).  *Taylor* and the JSSA, read together, guarantee both state and federal criminal defendants the right to a grand and petit (trial) jury selected from a pool of people that fairly represents the community in which they are being tried.

We assess fair cross-section challenges under the burden-shifting framework set forth in *Duren v. Missouri*, 439 U.S. 357 (1979).  To establish a prima

12

facie violation of the fair cross-section requirement, the defendant must show that: (1) "the group alleged to be excluded is a 'distinctive' group in the community"; (2) "the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community"; and (3) "this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* at 364. Once the defendant satisfies all three of these elements, the burden shifts to the prosecution to show that a significant government interest is "manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." *Id.* at 367–68. The *Duren* framework governs fair cross-section challenges under both the Sixth Amendment and the JSSA. *United States v. LaChance*, 788 F.2d 856, 864 (2d Cir. 1986).

There is no dispute that Black and Hispanic or Latino people are distinctive groups in the District. Accordingly, the only issues in this appeal are prongs two and three of the *Duren* test: whether the representation of Black and Hispanic or Latino people in SDNY venires is not fair and reasonable in relation to the number of such persons in the community, and whether this asserted underrepresentation is the product of systematic exclusion in the SDNY's jury selection process. We consider each question in turn.

13

*A. Underrepresentation*

    i.  <u>Preliminary Issues</u>

Assessing whether and to what extent Black and Hispanic or Latino people are underrepresented in SDNY venires requires answering three preliminary questions: First, what is the relevant community population? Second, at what stage of the jury selection process do we look for underrepresentation? And third, which method or methods of statistical analysis do we use to assess the significance of that underrepresentation?

The parties agree that the relevant community population against which SDNY venires should be compared is the population eligible for jury service in the SDNY's Manhattan courthouse: residents of New York, Bronx, Westchester, Putnam, and Rockland Counties who are at least eighteen years old. *See Rioux*, 97 F.3d at 657 ("We conclude that the appropriate measure in this case is the eighteen and older subset of the population, regardless of other qualifications for jury service.").

As to the second question, Slaughter assesses underrepresentation by comparing the number of Black and Hispanic or Latino people in the Manhattan *Qualified* Wheel to the number of Black and Hispanic or Latino people in the relevant community population. The government, on the other hand, argues that

we must compare *both* the Manhattan Qualified Wheel *and* the Manhattan Master Wheel to the relevant community population, depending on the systematic defect identified by Slaughter and the stage at which that alleged defect affects the jury selection process. So, to the extent Slaughter argues that the underrepresentation of Black and Hispanic or Latino people results from reliance on voter registration lists as the exclusive source of prospective juror names and from the practice of updating the Master Wheel only once every four years, those are defects that would affect the composition of the Manhattan *Master* Wheel, and this Court should look to the disparities in the Master Wheel to assess whether the underrepresentation is significant. On the other hand, to the extent Slaughter argues that the underrepresentation is caused by the SDNY's failure to follow up on jury qualification questionnaires that are not returned or returned as undeliverable, those are defects in the composition of the Manhattan *Qualified* Wheel, and this Court should look to the disparities in the Qualified Wheel to assess the significance of the underrepresentation.

The government's argument improperly blurs the lines between *Duren*'s second and third prongs. Prong two asks whether "the representation of [the distinctive groups] *in venires from which juries are selected* is not fair and reasonable in relation to the number of such persons in the community[.]" *Duren*, 439 U.S. at

364 (emphasis added).  At least in the SDNY, the ultimate venires from which

grand and petit juries are selected are the Qualified Wheels.  *Duren* prong two

focuses on the alleged disparity and whether it is quantitatively significant enough

to warrant further scrutiny as to its root causes.  It is only at prong three that we

consider whether the disparity is actually caused by a particular defect in the jury

selection process.  At that step, in assessing whether an identified disparity in the

venire from which jurors are chosen arises from a systemic defect, we focus on the

stage in the selection process—Master Wheel or Qualified Wheel—impacted by

the claimed defect.  We therefore reject the government's argument and, for

purposes of *Duren* prong two, assess the disparities as they exist in the Manhattan

Qualified Wheel.

As to the third question, courts have considered several statistical models to

assess whether and to what extent a distinctive group is underrepresented in a

district's venires.  Slaughter offers three models of statistical analysis to

demonstrate significant underrepresentation of Black and Hispanic or Latino

people in the Manhattan Qualified Wheel: the absolute disparity or absolute

numbers method, the statistical decision theory, and the comparative disparity

method.  We explored each of these models in *Rioux*, 97 F.3d at 655–67.

The absolute disparity method "measures the difference between the group's representation in the general population and the group's representation in the qualified wheel." *Id.* at 655. The absolute disparity method is sometimes referred to as the absolute numbers method because it allows the court to calculate the average difference per venire in the number of jurors from the distinctive group due to underrepresentation. *Id.*

Slaughter's expert estimates that Black people comprise 21.19% of the relevant population but only 16.08% of the Manhattan Qualified Wheel, resulting in an absolute disparity of 5.11%, while Hispanic or Latino people comprise 28.44% of the relevant population but only 19.41% of the Manhattan Qualified Wheel, resulting in an absolute disparity of 9.03%. App'x 51–52. Using slightly different population statistics, the government's expert estimates absolute disparities of 5.72% for Black people and 9.88% for Hispanic or Latino people. App'x 95–96. Converting these estimates to absolute numbers, and assuming that the average venire contains 60 people, the SDNY would have to add, on average, between 3–4 Black people and 5–6 Hispanic or Latino people to every venire to eliminate the disparities.

Slaughter's expert also analyzed disparities under statistical decision theory and the comparative disparity method. Statistical decision theory "measures the

likelihood that underrepresentation could have occurred by sheer chance." *Rioux*, 97 F.3d at 655. According to the theory, the more improbable it is that a particular jury pool resulted from random selection, the more likely there is a defect in the jury selection process. *Id.* The comparative disparity method, on the other hand, "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Rioux*, 97 F.3d at 655 (citation omitted). Comparative disparity is calculated by dividing the absolute disparity by the group's percentage in the population, then multiplying by 100 (to turn the figure into a percentage). *Id.*

In *Rioux*, we rejected the statistical decision theory and comparative disparity approaches and embraced the absolute disparity/absolute numbers method to assess underrepresentation. *See Rioux*, 97 F.3d at 655–56. But we have recognized the limits of this method "when applied to an underrepresented group that is a small percentage of the total population," because an underrepresentation that can be fixed by adding "only" one or two members to an average venire might "lead to the selection of a large number of venires in which members of the group are substantially underrepresented or even totally absent." *United States v. Jackman*, 46 F.3d 1240, 1247 (2d Cir. 1995) (dealing with district in which Black and Hispanic people comprised 6.34% and 5.07% of the population, respectively); *see*

*also United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990) ("[T]he Sixth Amendment assures only the *opportunity* for a representative jury, rather than a representative jury itself, but that opportunity can be imperiled if venires regularly lack even the small numbers of minorities necessary to reflect their proportion of the population." (citations omitted)); *see generally Berghuis v. Smith*, 559 U.S. 314, 329 (2010) (discussing imperfections inherent in each statistical approach). Thus mindful that the circumstances of any given case may warrant the use of different or even multiple modes of statistical analysis, here we proceed, as the district court did, with the absolute disparity/absolute numbers method.

ii.  <u>Application of the Absolute Disparity/Absolute Numbers Method</u>

Slaughter's expert estimates absolute disparities in the Manhattan Qualified Wheel of 5.11% for Black people and 9.03% for Hispanic or Latino people. App'x 51–52. The government's expert estimates absolute disparities of 5.72% for Black people and 9.88% for Hispanic or Latino people. App'x 95–96. In absolute numbers, the SDNY would have to add between 3–4 Black people and 5–6 Hispanic or Latino people to the average 60-person venire to eliminate the disparities.

The district court did not make any findings as to the parties' statistics. Instead, it assumed without deciding that the disparities are sufficiently "substantial or significant" to satisfy *Duren* prong two. App'x 163.

The disparities presented in this case are greater than any that have previously passed muster in this Court. *See Anderson v. Cassacles*, 531 F.2d 682, 685 (2d Cir. 1976) (finding no fair cross-section violation in the Northern District of New York with an absolute disparity of 2% for Black people); *Rioux*, 97 F.3d at 657–68 (finding no fair cross-section violation in the District of Connecticut with absolute disparities of 1.58%–2.08% for Black people and 2.14% for Hispanic people); *United States v. Jenkins*, 496 F.2d 57, 64 (2d Cir. 1974) (finding no fair cross-section violation in the District of Connecticut with an absolute disparity of 2.15% for Black people).

The highest disparities previously encountered by this Court also involved a challenge to the SDNY's jury selection plan. *See Biaggi*, 909 F.2d at 677. In *Biaggi*, the defendant asserted that the SDNY's use of voter registration lists as the exclusive source of prospective jurors resulted in unlawful underrepresentation of Black and Hispanic people. *Id.* at 676–77. An evidentiary hearing revealed absolute disparities of 3.6% for Black people and 4.7% for Hispanic people. *Id.* at 677. From these statistics, the district court estimated that the addition of two

Black people and two to three Hispanic people to the average 60-person venire would eliminate the underrepresentation, and concluded those figures were "not so great as to amount to a violation of the fair cross-section requirement." *Id.* at 678 (citation omitted).

We affirmed, holding that the disparities were insubstantial and opining that the use of voter registration lists as the exclusive source of prospective jurors was, at least in that case, "benign." *Id.* However, in light of the infirmity of the absolute numbers approach when the group in question comprises a relatively small proportion of the population, we cautioned that we "would find the Sixth Amendment issue extremely close if the underrepresentation had resulted from any circumstance less benign than use of voter registration lists." *Id.*

Slaughter argues that the current underrepresentation of Black and Hispanic or Latino people in SDNY venires is significant enough to satisfy *Duren* prong two, placing particular emphasis on our discussion in *Biaggi*. The government disagrees, stressing that *Duren* does not require perfect

representativeness and citing to cases from other circuits where courts imposed a 10% minimum disparity to satisfy *Duren* prong two.[6]

These disparities are troubling, especially considering the fact that underrepresentation of Black and Hispanic or Latino people in SDNY venires has only *increased* in the decades since *Biaggi*. But we are wary of wading into the difficult line-drawing required at the second prong of the *Duren* analysis unless absolutely necessary. For that reason, like the district court, for the purpose of assessing the third *Duren* prong, we assume without deciding that the disparities identified by Slaughter satisfy the second prong of *Duren*.

### B. *Systematic Exclusion*

Assuming the disparities are significant, we turn to *Duren* prong three and ask whether the underrepresentation of Black and Hispanic or Latino people is caused by systematic exclusion of these groups in the SDNY's jury selection process. Slaughter argues that the persistence of the disparities alone establishes systemic underrepresentation for purposes of *Duren* prong three, and also identifies several features of SDNY's selection process that he contends drive

---

[6] *See, e.g., United States v. Phillips*, 239 F.3d 829, 842 (7th Cir. 2001) ("[A] discrepancy of less than ten percent alone is not enough to demonstrate unfair or unreasonable representation of [Black people] on the venire." (citation omitted)); *United States v. Grisham*, 63 F.3d 1074, 1078–79 (11th Cir. 1995) ("If the absolute disparity . . . is 10 percent or less, the second element is not satisfied."). The government does not explicitly invite this Court to adopt a bright line minimum disparity for *Duren* prong two.

systemic exclusion of Black and Hispanic or Latino people.  Both arguments are unavailing.

### i.  Persistence

First, Slaughter asserts that a "long period of significant underrepresentation," standing alone, is sufficient to establish systematic exclusion.  Appellant's Br. at 38.  In support of his argument, Slaughter points to data demonstrating increasing disparities in Black and Hispanic or Latino representation in SDNY venires over the past two decades and cites to a particular passage from *Duren*:

> [I]n order to establish a prima facie case, it was necessary for petitioner to show that the underrepresentation of women, generally and on his venire, was due to their systematic exclusion in the jury-selection process. Petitioner's proof met this requirement. *His undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic*—that is, inherent in the particular jury-selection process utilized.

439 U.S. at 366 (emphasis added).  Slaughter also cites to several cases from other circuits concluding that significant disparities over a sustained period of time may prove systematic exclusion.  *See, e.g.*, *Barber v. Ponte*, 772 F.2d 982, 989 (1st Cir. 1985); *United States v. Test*, 550 F.2d 577, 586 (10th Cir. 1976).

The government argues that Slaughter's position, if accepted, would improperly collapse prongs two and three of *Duren* and relieve defendants of their burden to show systematic exclusion.  The district court adopted the same position.

To be sure, *Duren* supports the idea that persistent disparities over a significant period of time may "*indicate*[] that the cause of the underrepresentation [is] systematic . . . ."  439 U.S. at 366 (emphasis added).  But we are aware of no Second Circuit or Supreme Court case in which the persistence of disparities over time, standing alone, satisfied *Duren* prong three.  Indeed, in *Duren* it was the presence of disparities over time *and* several practices that effectively excluded 39.5% of eligible women from jury service that, together, demonstrated systematic exclusion.  439 U.S. at 365–67.  Thus, while the continued and increased disparities in Black and Hispanic or Latino representation in the SDNY may be relevant to whether those disparities are systemic, we decline to hold that the persistence of disparities by itself satisfies *Duren* prong three.  We still have to consider what factors intrinsic to the jury venire selection process, if any, systemically drive the identified and persistent disparities.

24

ii.   Specific Practices

Slaughter argues that three aspects of the Plan cause underrepresentation of Black and Hispanic or Latino people in SDNY venires: (1) reliance on voter registration lists as the exclusive source of names for prospective jurors, (2) updating the Master Wheels only once every four years, and (3) refusal to follow up on jury qualification questionnaires that are not returned or returned as undeliverable.  Although Slaughter's expert asserts that each of these practices causes underrepresentation of Black and Hispanic or Latino people, he provides no data to support that assertion.

The government counters that any disparities in Black and Hispanic or Latino representation are the result of external forces outside the District's control, rather than systematic defects in the Plan.  And the government offers its own data to refute Slaughter's assertion that certain aspects of the Plan cause underrepresentation.

As to the use of voter registration lists, the government's expert examined statewide data and found that Black people were more likely to register to vote by 1% whereas Hispanic or Latino people were less likely to register by 7.2%.  The expert did not find these numbers to be statistically significant, and the government argues that any disparities caused by the use of voter registration lists

are the result of an external factor outside the SDNY's control: the choice whether to register to vote.  In other words, it is not the SDNY's fault that Hispanic or Latino people are less likely to register to vote.

Likewise, the government's expert examined several years of data to isolate the expected impact of updating the Master Wheels only once every four years and found that practice contributed less than one percentage point to the disparities for each group: 0.32% percent for Black people and 0.71% percent for Hispanic or Latino people.  The government argues these disparities are the result of benign demographic changes such as moving, rather than any aspect of the SDNY's Plan.

Moreover, insofar as the SDNY's reliance on voter registration lists and its (former) practice of updating the Master Wheels only once every four years affect the composition of the *Master* Wheels, the government urges this Court to look to the disparities in the Manhattan Master Wheel, rather than the Manhattan Qualified Wheel, to assess the impact of these practices on venire demographics. The government's expert estimated absolute disparities of 1.34% for Black people and 0.04% for Hispanic or Latino people in the Manhattan Master Wheel, as

compared to disparities of 5.72% and 9.88% in the Qualified Wheel.[7]  Based on these and its expert's other findings, the government concludes that reliance on voter registration lists and updating the Master Wheel once every four years do not cause significant underrepresentation of Black and Hispanic or Latino people in SDNY venires.

As to the SDNY's failure to follow up on questionnaires returned as undeliverable, the government's expert found that undeliverable questionnaires occurred only 7.4% of the time.  He also determined that questionnaires sent to Black people were only slightly more likely to be undeliverable than those sent to others, while questionnaires sent to Hispanic or Latino people were slightly *less* likely to be returned as undeliverable.  In addition to emphasizing these statistics, the government argues that the inability to serve juror questionnaires because they were returned as undeliverable is an external force over which the SDNY has no control.

Although the government's expert did find that Black and Hispanic or Latino people disproportionately failed to respond to jury qualification

---

[7] Unlike with the Manhattan Qualified Wheel, there is no demographic data on the Manhattan Master Wheel.  Thus, the government's expert relied on geocoding to estimate the percentage of Black and Hispanic or Latino people in the Manhattan Master Wheel.  We need not opine on the accuracy of this method, as Slaughter's claim principally fails due his own lack of proof as to systematic exclusion.

questionnaires, the government asserts that whether to respond to a jury qualification questionnaire is an individual decision that the jury selection system cannot control. Thus, the government contends, any resulting underrepresentation is not caused by the SDNY.

The district court rejected Slaughter's argument that the disparities in Black and Hispanic or Latino representation are the result of systematic exclusion. First, the court found that Slaughter "has not put forth evidence that any of these [challenged] practices causes or contributes to the identified disparities." App'x 166. Second, the court concluded that "most of these practices have been specifically authorized by the Second Circuit." *Id.* And third, the court determined that any underrepresentation in venires is due to "external forces" outside the SDNY's control, "not defects inherent in the district's jury plan." *Id.* at 167.

Regarding the use of voter registration lists as the exclusive source of names for prospective jurors, the district court reasoned that the Second Circuit has "specifically authorized" this practice. App'x 166–67 (citing *United States v. Young,* 822 F.2d 1234, 1239 (2d Cir. 1987)). As to refilling the Master Wheels only once every four years, the court was "unpersuaded that this practice constitutes . . . systematic exclusion," and found that demographic shifts that might occur in a

four-year period such as "moving rates and [reaching voting age] are external forces and not defects inherent in the district's jury plan."  App'x 167.  Finally, with respect to the SDNY's failure to follow up on jury qualification questionnaires that are not returned or returned as undeliverable, the district court concluded "the Second Circuit has found [] similar conduct does not amount to systematic exclusion."  App'x 168 (citing *Rioux*).

We conclude that Slaughter has not met his burden under *Duren* prong three for the principal reason that he has provided no evidence that the challenged practices actually cause underrepresentation of Black and Hispanic or Latino people in SDNY venires.  The assertion of his expert that certain aspects of the Plan cause underrepresentation, without data to back that up, is not enough to demonstrate systematic exclusion.

As noted, the government's expert did find that Black and Hispanic or Latino people disproportionately failed to respond to jury qualification questionnaires, significantly contributing to their underrepresentation on the Qualified Wheels.  *See* App'x 107 ("[T]he primary reason that African Americans are underrepresented on the qualified wheel is that they disproportionately do not respond to the questionnaire sent.  The same pattern holds for Hispanics.").  Slaughter, however, makes no use of the government's data to support his

systematic exclusion argument.  Nor does he offer any data to suggest that the content of those questionnaires, the process by which they are disseminated, or any other factor within *the District's* control contributes to the disproportionate response rate.  Without more, he has failed to carry his burden under *Duren* to establish a prima facie violation of the fair cross-section requirement.

Our assessment is driven by the data and expert evidence in this case.  We express no opinion on the viability of Slaughter's *theories* as to why the disparities exist; he has failed to muster persuasive data to support his hypotheses.  Because we reject Slaughter's fair cross-section challenge on this basis, we need not address the district court's other grounds for rejecting Slaughter's claims.  In sum, because Slaughter has put forth no persuasive evidence that the challenged aspects of the Plan actually cause underrepresentation of Black and Hispanic or Latino people in SDNY venires, we affirm.

## CONCLUSION

The Sixth Amendment and the JSSA do not guarantee perfect representativeness in grand and petit jury pools.  But there may come a time where persistent disparities, sufficiently proven to be caused by the district's jury selection process, can no longer be tolerated without contravening the JSSA and the Sixth Amendment.  In this case, Slaughter has not established that the Plan

causes underrepresentation of Black and Hispanic or Latino people in SDNY venires.  Our assessment is driven by a review of the evidence in the record, not broad conclusions of law.  And nothing in our opinion precludes the possibility that a future challenge with greater proof might establish that the disparities identified in the record are systemic.

For the above reasons, we **AFFIRM** the judgment of the district court.